**RAPID TRANSIT LINES, INC., Appellant,**

**v.**

**TRANSIT ADS, INC., Appellee.**

**No. 4001.**

Court of Civil Appeals of Texas.

Eastland.

Feb. 4, 1966.

Rehearing Denied March 25, 1966.

Baker, Botts, Shepherd & Coates, Hofheinz & James, Houston, for appellant.

Brown, Kronzer, Abraham, Watkins & Steely, Houston, for appellee.

WALTER, Justice.

Transit Ads, Inc., recovered a judgment against Rapid Transit Lines, Inc., for breach of contract and Rapid Transit has appealed. It asserts that it was never legally bound by Transit Ads' contract; that it was entitled to a judgment on the basis of the jury findings; that plaintiff's judgment is based on the doctrine of anticipatory breach and, as a matter of law, it is not applicable and the court erred in rendering judgment for $209,136.10 because that sum includes $134,250.00 attributable to a five year period immediately after April 30, 1965. It being its contention that Transit Ads' rights in this five year period were dependent upon a condition precedent which did not occur. It also contends the charge contains several errors.

Irwin Winston was president of Transit Ads, Inc. This company was in the trans-portation advertising business. Transportation Advertising Sales had a contract with Houston Transit Company to handle the advertising on its buses. Transportation Sales assigned its interest in the contract to Transit Ads. Thereafter Houston Transit and Transit Ads entered into a new contract, dated April 14, 1960. This contract provided in part the following:

"THIS AGREEMENT, made this 14th day of April, 1960, between Houston Transit Company of Houston, Texas, hereinafter called the party of the first part and the Transit Ads, Inc. of Houston and the state of Texas, hereinafter called the party of the second part.

WITNESSETH: That the party of the first part for itself, its successors and assigns has let and by these present does let and license, unto the party of the second part, its successors, assigns and legal representatives, sole and exclusive advertising rights and privileges in, upon and about all of the buses now or hereafter owned or controlled by or operated by the party of the first part or upon any of its lines for and during a period commencing on the 1st day of May, 1960, and ending the 30th day of April, 1965. TRANSIT ADS, INC. shall have the option to extend the term of this contract for an additional period of 5 years on condition that the Houston Transit Company franchise with the City of Houston shall be extended to coincide with the above mentioned extension. Transit Ads, Inc. shall notify Houston Transit of its election to exercise said option in writing on or before 12 months prior to the expiration of the original term hereof.

IN consideration of the exclusive advertising privileges granted herein the party of the second part agrees to pay the party of the first part a sum equal to fifty (50%) percent of the gross sales (gross sales shall be construed to mean less only (a) cost of painting to be deducted in the following fashion: curb and traffic side painted spectaculars $10.00 for each position; painted rear displays $5.00 per

month, (b) legitimate advertising agency commissions actually paid by Transit Ads, Inc.) collected of the advertising sold by the party of the second part and carried by the party of the first part for any person, firm, corporation, or advertising agency for advertising placings in or about such buses during each month that this contract remains in force. The party of the second part agrees to send the party of the first part a monthly statement of collections made during the previous month together with a check for 50% of these collections.

*  *  *  *  *  *

THIS contract is not assignable or transferable without the consent of both parties."

Bernard E. Calkins, president of Rapid Transit Lines, testified substantially as follows: Rapid Transit Lines was organized for the purpose of acquiring a franchise from the City of Houston; Houston Transit Company was operating the buses in the City of Houston under a franchise before we took over; Houston Transit stock was acquired for the purpose of acquiring its physical assets that could be used under the new franchise; I made a study and was familiar with the assets and liabilities of Houston Transit; I was aware of the fact that Transit Ads was handling the advertising for Houston Transit and had a contract with it; I had studied the details of such contract before I purchased Houston Transit; I took over Houston Transit on May 25, 1961; Houston Transit has been dissolved; Rapid Transit acquired all of its assets; Rapid Transit Lines commenced operating its buses in Houston on June 1, 1961; I recognized Transit's contract insofar as Houston Transit was concerned up to May 31; I do not contend that Winston did anything or failed to do something that caused me to terminate the contract; I am saying that the contract was an obligation of Houston Transit Company and it ended when its franchise terminated. I did not learn that Transit Ads had paid $55,000.00

for its contract for some two months after I took over operation of the buses.

Referring to Transit Ads' April 14, 1960, contract, Mr. Calkins said: "* * * I never said and do not take the stand that I do not assume the obligations under the contract under the Houston Transit Company, and up to the time when the Houston Transit Company operated under the franchise with the City of Houston, but I, as Rapid Transit Lines, have never negotiated a contract with Mr. Winston."

Mr. Calkins was asked the following question: "During the period then up to June 1st, 1961, the period I am now directing your attention to, did you ever state to Mr. Winston, take the position with him the contract was not binding, not obligating on the Houston Transit Company?" and he gave the following answer, "I think it was pretty well discussed. It was our feeling the contract would not be binding on Rapid Transit, which would be taking over June 1st and that—I did not ever state that it was not binding on Houston Transit Company for whatever obligation may be there."

The Special Issues that were answered are as follows:

## "SPECIAL ISSUE NO. 1

Do you find from a preponderance of the evidence that on or before June 1, 1961, Bernard E. Calkins expressly communicated to Transit Ads, Inc., an unequivocal repudiation of any liability or obligations on the part of Rapid Transit Lines, Inc., to Transit Ads, Inc., by virtue of the written contract dated April 14, 1960, being Exhibit 5 in evidence herein?

ANSWER: 'We do.' "

"The term 'repudiation' as used in the foregoing issue means a present, distinct, and absolute denial by a party of any obligation under or by virtue of a contract; and a mere assertion by a party that he will refuse to perform a contract

at some future time does not constitute a breach or repudiation of such contract."

## "SPECIAL ISSUE NO. 2

"Do you find from a preponderance of the evidence that Transit Ads, Inc. rendered substantial performance of the written contract, dated April 14, 1960, being Exhibit 5 in evidence herein, after the execution of such contract until June 1, 1961?

ANSWER: 'We do.' "

## "SPECIAL ISSUE NO. 3

Do you find from a preponderance of the evidence that Carl B. Frazier executed the written contract, dated April 14, 1960, being Exhibit 5 in evidence herein, within the scope of his actual authority as president of Houston Transit Company?

ANSWER: 'We do.' "

## "SPECIAL ISSUE NO. 4

Do you find from a preponderance of the evidence that Carl B. Frazier executed the written contract, dated April 14, 1960, being Exhibit 5 in evidence herein, as the apparent agent of Houston Transit Company?

ANSWER: 'We do.' "

## "SPECIAL ISSUE NO. 5

Do you find from a preponderance of the evidence that following the execution of the written contract, dated April 14, 1960, being Exhibit 5 in evidence herein, Houston Transit Company ratified such written contract?

ANSWER: 'We do.' "

## "SPECIAL ISSUE NO. 6

Do you find from a preponderance of the evidence that Transit Ads, Inc. materially relied upon the provisions of the written contract, dated April 14, 1960, being Exhibit 5 in evidence herein, for the original term of five years and for an option to extend the term an additional five years, as a material inducement for undertaking the performance of such contract?

ANSWER: 'We do.' "

## "SPECIAL ISSUE NO. 7 .

Do you find from a preponderance of the evidence that Bernard E. Calkins had actual knowledge of such reliance, if any, before Rapid Transit Lines, Inc. was incorporated?

ANSWER: 'We do.' "

## "SPECIAL ISSUE NO. 8

Do you find from a preponderance of the evidence that before the incorporation of Rapid Transit Lines, Inc., Bernard E. Calkins, by the exercise of reasonable diligence and prudence, should have known of such reliance, if any?

ANSWER: 'We do.' "

## "SPECIAL ISSUE NO. 9

Do you find from a preponderance of the evidence that such reliance, if any, was known by Rapid Transit Lines, Inc. before the properties and assets of Houston Transit Company were transferred, conveyed and assigned to Rapid Transit Lines, Inc.?

ANSWER: 'We do.' "

## "SPECIAL ISSUE NO. 10

Do you find from a preponderance of the evidence that Transit Ads, Inc., through its President Irvin Winston after June 1, 1961, caused to be made materially false and fictitious entries in the books of account of Transit Ads, Inc. for the month of May, 1961, for the purpose of concealing the facts concerning true collections?

ANSWER: 'We do.' "

## "SPECIAL ISSUE NO. 11

Do you find from a preponderance of the evidence that Transit Ads, Inc. through Irvin Winston after June 1, 1961, willfully and intentionally made a materially false report of collections for the purpose of attempting to withhold funds collected during May of 1961?

ANSWER: 'We do.' "

## "SPECIAL ISSUE NO. 12

Do you find from a preponderance of the evidence that before June 1, 1961, Transit Ads, Inc. willfully and intentionally made materially false reports of collections for the purpose of attempting to withhold funds from the Houston Transit Company?

ANSWER: 'We do not.' "

## "SPECIAL ISSUE NO. 13

Do you find from a preponderance of the evidence that such act, if any you have found, or such acts, if any you have found, are so inconsistent with the relationship between the parties as to justify the termination of the relationship?

ANSWER: 'We do.' "

## "SPECIAL ISSUE NO. 14

From a preponderance of the evidence, which of such acts, if any you have found, justify the termination of the relationship?

ANSWER: 'Acts defined in Special Issues #10 and #11."

## "SPECIAL ISSUE NO. 15

Do you find from a preponderance of the evidence that from June 1, 1961, until September 1, 1961, Rapid Transit Lines, Inc. continued to allow the employees of Transit Ads, Inc. free access to the buses for the purpose of placing their advertisements on such buses?

ANSWER: 'We do.' "

## "SPECIAL ISSUE NO. 16

Do you find from a preponderance of the evidence that the memorandum of agreement dated April 14, 1960 resulted from a plan by A. D. Martin to deprive Houston Transit Company of a valuable corporate asset fraudulently and without payment of funds to the Houston Transit Company?

ANSWER: 'We do not.' "

## "SPECIAL ISSUE NO. 19

Do you find from a preponderance of the evidence that from June 1, 1961 until September 1, 1961 Irvin Winston as President of Transit Ads, Inc. elected to waive any claim of damages by reason of any prior repudiation, if any, of the written contract of April 14, 1960, exhibit 5 herein?

ANSWER: 'We do not.' "

## "SPECIAL ISSUE NO. 20

What sum of money, if any, do you find from a preponderance of the evidence to be the present cash value of such net profits, if any, that Transit Ads, Inc. would in reasonable probability have made if it had continued in the use, development and sale of advertising material and space in accordance with the provisions of the written contract, dated April 14, 1960, being Exhibit 5 in evidence herein, taking into account the following elements to the extent, if any, that they are established by a preponderance of the evidence, and none other:

(1) The reasonable present cash value of such net profits, if any, as Transit Ads, Inc. would have made from and after June 1, 1961, until April 30, 1965.

ANSWER: $85,000.00.

(2) The reasonable present cash value of such net profits, if any, as Transit Ads, Inc. would in reasonable probability have made during the five year period immediately following April 30, 1965.

ANSWER: $134,250.00."

■ Rapid Transit was a mere continuation of Houston Transit and was a "successor" within the meaning of the April 14, 1960, contract. Article 5.06, Texas Business Corporation Act, V.A.T.S.

■ Rapid pleaded that it had no legal obligation to honor the Transit Ad contract. Its president testified distinctly and unequivocally that the contract was not binding on his company. The record reveals that Rapid did not recognize and refused to perform under the agreement. The foregoing and other facts and circumstances in evidence established an anticipatory breach of the contract. Pollack v. Pollack (Com. App.), 46 S.W.2d 292; Continental Casualty Company v. Boerger, Tex.Civ.App., 389 S.W.2d 566 (writ dismissed).

■ Appellant's position that Transit did not accept such repudiation and treat it and act upon it as such cannot be sustained. It contends that the contract was left open during the disputed period from June 1, 1961, to September 7, 1961, because both parties were performing under the contract. It is true that Calkins recognized his obligations under the contract insofar as Houston Transit was concerned.

Appellants contend that this conduct on the part of both parties and the answer to issue number fifteen constitute performance under the contract. The record conclusively shows that such activity on the old buses was not permitted by Calkins as an obligation under the contract insofar as Rapid was concerned, but was permitted as Houston Transit's obligation. Calkins never did take the position with Winston that the contract was not binding on Houston Transit:

"Q. So that as of the day June 1st, 1961, so far as Rapid Transit Lines were concerned, you considered and told Mr. Winston that he had no binding contract with that company?

A. That is right. And the telegram bears that out."

Calkins sent Winston a telegram on June 1, 1961, which reads as follows:

"RAPID TRANSIT LINES HAS TAKEN OVER OPERATION OF TRANSIT SERVICE IN HOUSTON EFFECTIVE TODAY, JUNE 1, 1961. AS YET WE HAVE NOT RECEIVED YOUR PROPOSAL FOR ADVERTISING SPACE AS DISCUSSED PREVIOUSLY."

■ Sometime thereafter Winston prepared a contract and submitted it to Calkins. It was not acceptable to him and was refused. During such time the parties considered that the old contract had been repudiated by Rapid and that Transit had accepted such repudiation. Otherwise, Rapid would not have requested a new contract and Transit would not have prepared a new one. In Continental Casualty Company v. Boerger, supra, the court said:

" 'No notice need be given by plaintiff that he treats defendant's repudiation as a breach. Nothing more is necessary than bringing the action, and this should be allowed at any time before the repudiation is withdrawn.' Henry W. Ballentine, 'Anticipatory Breach,' Select Readings on the Law of Contracts, Association of American Law Schools 1931, p. 1085."

■ Appellant contends it was justified in terminating the contract because Winston made false entries in his books and made false reports of collections for the purpose of withholding funds. In issues ten and eleven the jury found that Winston, after June 1, 1961, made false entries in its books for the month of May, 1961, and made a false report of collections for that month.

Transit contends that the contract was breached on June 1, 1961. Appellant contends that the breach, if any, occurred in September when it refused Winston access to the new buses. Transit says: "Thus, our position is alternative when we urge that this is truly an actual breach of contract case in which there has been an entire repudiation of obligation at the time for per-

formance, and that also under these circumstances the alleged subsequent improper accounting is totally immaterial."

Winston testified that after his discussion with Calkins he was faced with the possibility of not being able to continue and he instructed his accounting department to withhold some of the money so that he could recoup some of his losses; that after Calkins had repudiated the contract, he returned to his office in New Orleans in June, 1961, and made some changes in his books; that the Jim Wright collection was not the only one that was changed, "There was a bunch of them that month"; that he has never returned the money but said: "The money is being held in one of our accounts and, as counsel told you, it is available as part payment for any judgment I may receive in this case."

The record establishes that Rapid was given credit on the judgment for this amount which had been tendered in Transit's pleadings.

Winston made false entries in his books and made false reports of collections after June 1, 1961. Can Calkins rely upon Winston's breach to avoid liability? Calkins testified that Winston did not do anything that caused him to take the position that Rapid was not obligated under the agreement. Winston's conduct in making the false entries in his books was not known to Calkins on or before June 1, 1961, when he communicated to Transit an unequivocal repudiation of any liability under the contract.

The jury found in answer to issue number two that Transit rendered substantial performance of the contract until June 1, 1961; that in answer to issue number one Calkins on or before June 1, 1961, communicated his repudiation of the contract. Rapid took over and started its operation on June 1, 1961. On or before such date it had totally breached the contract when the time for performance was at hand. "Again, when one party repudiates his agreement or declines to perform it at the time when per-

formance on his part is due, this is in itself a breach of the contract which discharges the other party and gives him a cause of action without any affirmative action on his part." 10–A Texas Jur. (Rev.), § 272, page 551.

In Haddaway v. Smith et al., Tex.Civ. App., 277 S.W. 728 (no writ history), the court said:

"If a party to a contract repudiates it or refuses to perform it when the time for performance on his part is due, it amounts to a breach, which operates as a discharge of the other parties. 5 Page on the Law of Contracts, par. 2908. The law of anticipatory breaches is not applicable to appellant's failure to perform in this case because performance on his part was due January 1st, and he was under contractual obligations to perform on the day named, and, on his repudiation of his contract, a cause of action arose against him without any affirmative action on the part of plaintiffs or the purchasers."

■ Appellant contends that the court erred in entering judgment for $209,136.10, because the sum includes $134,136.10 attributable to the five year option period after April 30, 1965. It contends that Transit's rights to this five year period was dependent upon the Houston Transit Company's franchise with the City of Houston being extended as provided for in the contract quoted above. We think this contention is without merit. We have been unable to find any authority supporting appellant's contention.

■ Appellant's fourth proposition is that "Rapid Transit Lines, Inc. was never legally bound by Transit Ads' contract." The agreement provides that the contract is not assignable without the consent of both parties. We believe that when Transit filed its suit on the contract that would be in legal contemplation an indication that it had consented to the assignment. Houston Transit, in effect, consented to the assignment when its stock was sold by its holding company

to Rapid. "Contracts otherwise unassignable because of the personal nature of the subject matter may be assigned if the other party gives his consent, which may be ascertained from circumstances surrounding the parties and the language in the contract itself." 6 Tex.Jur.2d, § 18, pages 413 and 414.

■ Appellant's contention is that the contract in question was not a balance sheet liability and, therefore, it is not legally bound by such contract. We think this contention is without merit because Rapid was a mere continuation of Houston Transit in the bus business. There was, in effect, a consolidation of the two companies. In American Surety Company of New York v. M–B Ise Kream Company, Tex.Civ.App., 38 S.W.2d 118, the court said:

> "The purchase of the assets of one corporation by another, as declared by 7 R.C.L. p. 183, are very similar, in the matter of the liability of the purchaser for the debts of the seller, to the liability of an individual who purchases the assets of a debtor, and the purchasing corporation does not, merely by reason of the purchase, become liable for the debts of the selling corporation. In the same paragraph the same authority states a general rule of law that is controlling in the instant case: 'So it may be stated as a general rule that in order to render the purchasing company personally liable for the debts of the selling corporation, it must appear that (a) there be an agreement to assume such debts; (b) the circumstances surrounding the transaction must warrant a finding that there was a consolidation of the two corporations; or (c) that the purchasing corporation was a mere continuation of the selling corporation; or (d) that the transaction was fraudulent in fact. * * *'"

Appellant contends that the court's charge contains errors of omission and commission. At the outset we are confronted with appellee's contention that the points of error under appellant's fifth proposition constitute a shotgun attack upon the court's charge in that its assignments in its motion for a new trial do no more than make general references to other motions and do not clearly identify the ground of error upon which it relies.

Point number twenty is as follows: "The trial court erred in submitting Special Issue No. 1 and basing his judgment upon the jury's finding to such Special Issue and overruling amended motion for new trial because the Special Issue fails to advise the jury that there can be no anticipatory breach where a party is in good faith actively engaged in the performance of the contract. (Germane to paragraph XXXVII of Amended Motion for New Trial)"

Paragraph XXXVII of appellant's amended motion for a new trial is as follows: "Defendant prays that the Court grant it a new trial because of the Court's failure to grant objection I(e), and in that connection would show the Court that Special Issue No. 1 was improperly submitted, and was prejudicial and reversible error because the issue submitted is excessively vague and indefinite and does not inquire about specific acts or specific statements alleged to constitute a 'unequivocal repudiation' and thus the issue is in effect a global issue, too broad and indefinite."

It will be noted that this assignment refers to objection I(e) without identifying the instrument where it may be found.

Points numbers twenty-three through thirty-four are said to be germane to paragraph XII(d) of appellant's motion for new trial. Paragraph XII (We are unable to find a XII(d) in the motion.) of the motion is as follows:

"Defendant moves the Court to grant a new trial because the Court erred in overruling paragraph XI of defendants' motion for judgment and to disregard certain jury findings."

There is no statement in the brief that Points numbers thirty-eight, forty-five and forty-six are germane to any assignment of

error as required by Rule 418(b), Texas Rules of Civil Procedure.

In Wagner v. Foster, 161 Tex. 333, 341 S.W.2d 887, the Supreme Court, in a Per Curiam opinion, said:

"Rules 320, 321, 322 and 374 govern the form of assignments of error in motions for new trial which become the basis for points of error on appeal. Rule 320 provides that the motion 'shall specify each ground on which it is founded, and no ground not specified shall be considered.' Rule 321 requires that the assignments in the motion refer to the action of the court complained of 'in such way as that the point of objection can be clearly identified and understood by the court.' Rule 322 directs that 'Grounds of objections couched in general terms * * * shall not be considered by the court.' Rule 374 provides that 'A ground of error not distinctly set forth in the motion for new trial, in cases where a motion for new trial is required shall be considered as waived.'"

"Assignments of error in a motion for new trial which do no more than adopt from or refer in general terms to other motions, etc. do not 'specify' or 'distinctly set forth', or 'clearly identify' a ground of error."

We are of the opinion that the assignments of error in appellant's motion for a new trial do not distinctly set forth the grounds of error upon which appellant relies in the points considered above. Wagner v. Foster, supra; Tindall v. Tacconelly, Tex.Civ.App., 328 S.W.2d 909, (writ ref. n. r. e.). However, we will consider appellant's points so that if we are mistaken about such ruling it will not be necessary for the Supreme Court to remand the case to this court for the purpose of passing upon such points.

We have considered all the evidence and find that the jury's answers to issues numbers 1, 2, 6, 7, 8, and 9 are not against the great weight and preponderance of the evidence. In Re King's Estate, 150 Tex. 662, 244 S.W.2d 660.

We conclude that the evidence set out above and other facts and circumstances in evidence constitute some evidence of probative force and support the answers to issues numbers 1, 2, 6, 7, 8, and 9.

We have considered all of appellant's points and find no merit in them. They are overruled.

The judgment is affirmed.