**FIRST FEDERAL SAVINGS & LOAN ASSOCIATION OF WILMETTE, ILL.**

v.

**Arch PARDUE, Jr., as Trustee and Individually, and Mike Lindsey & Co., Inc., a Texas Corporation.**

**No. CA 3–81–0309–C.**

United States District Court, N. D. Texas, Dallas Division.

Aug. 12, 1982.

---

434

Corbet F. Bryant, Jr., and Robert H. Mow, Jr., Carrington, Coleman, Sloman & Blumenthal, Dallas, Tex., for plaintiff.

Thomas P. Earls, Dallas, Tex., for defendants.

## OPINION

WILLIAM M. TAYLOR, Jr., District Judge.

Plaintiff is a corporation chartered under the laws of the United States and domiciled in Illinois. So for diversity purposes, it is treated as an Illinois corporation. Defendant Pardue is an individual residing in the State of Texas, and Mike Lindsey & Co., Inc., is a Texas corporation with its principal place of business in Texas. It is without dispute that $10,000 is in dispute. So this Court does have jurisdiction under 28 U.S.C. § 1332.[1]

On September 11, 1980, Plaintiff and Defendant (and Counter-Plaintiff) Pardue signed a real estate contract for a parcel of land in Farmers Branch, Texas, and a restaurant building on that land which had been operated under the name "Daddy's Money" until it failed and Plaintiff foreclosed the mortgage on the property. Defendant (and Counter-Plaintiff) Mike Lindsey & Co., Inc., was the real estate broker for this transaction. This Defendant's claim will not be spoken to very much as it is ancillary to the claims of the other Parties.

---

1. 28 U.S.C. § 1332(a) reads:

(a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and is between—

(1) citizens of different States;

(2) citizens of a State and citizens or subjects of a foreign state;

(3) citizens of different States and in which citizens or subjects of a foreign state are additional parties; and

(4) a foreign state, defined in section 1603(a) of this title, as plaintiff and citizens of a State or of different States.

This property is encumbered in favor of a Texas general partnership, Crow & Brown No. 9, in three pertinent ways. The property may only be used as a restaurant of a certain high quality. The partnership also has a right of first refusal to buy the property when an agreement to sell the property is reached on the same terms and conditions as agreed upon by the seller and prospective buyer. The last major encumbrance is that the partnership has the option to repurchase the property and the improvements on it on July 23, 1994.

This September 11, 1980 contract was very valuable to Pardue in that it stipulated that upon approval of a loan application of Pardue or an entity of which he was a principal, he would be granted a loan of $750,000 out of the total purchase price of $950,000. The net interest on this loan was to be 9%. It was without dispute at trial that such loans as this were not obtainable in the normal course of business in September, 1981. There was not much dispute but that if such a loan were then obtainable, the interest rate would have been 13%.

Plaintiff did receive approval of the transaction from Crow & Brown No. 9 upon the representation that the restaurant would be operated by a certain well known Dallas restaurateur either as a partner of Pardue or as a lessee.

Pardue, individually, did make a loan application to Plaintiff which was accepted in a commitment letter of October 3, 1980. It is important to note that this is the only loan application that has ever been submitted by Pardue and none has ever been submitted by any entity with which Pardue is connected.

Mr. Pardue did not unconditionally accept Plaintiff's loan commitment but tried to vary its terms and the terms of the September 11, 1980 contract in a letter of October 15, 1980, from his lawyer to Plaintiff's lawyer.

This letter, pursuant to a clause in the September 11, 1980 contract objected to a few items in the Sellers Title Policy commitment furnished by Plaintiff. The letter itself stated that it was understood that three of these items could be taken care of easily before closing. This was also the undisputed testimony at trial.

The other objection was not to any specific item in the Title Policy commitment but to any liens or claims of the Trustee in Bankruptcy for the original owner of the property. Addendum "A2" of the September 11, 1980 contract specifies:

> The parties acknowledge that First Federal Savings & Loan Association of Wilmette shall use its best efforts to acquire full right, title and interest in and to all personalty, including fixtures, furniture, and kitchen equipment currently located in the Building which is located upon the Property. It is expressly agreed, however, that to the extent any consideration must be paid to any prior owner or other party claiming an interest, whether as owner or lien holder, against said items, all such consideration shall be paid by Purchaser in addition to the other consideration recited in this Contract, if Purchaser desires such Property.

It appears that the Trustee in Bankruptcy was the holder of the title to the personalty that was in the restaurant building. Pardue does not dispute that Plaintiff is the owner of the realty which, of course, includes the building and the fixtures.

Plaintiff had made a deal with the Trustee to buy the personalty for in excess of $40,000. This deal was concluded some months later. But in Pardue's attorney's letter of October 15, 1980, it was stated that Pardue would only pay $10,000.

The Parties have made much ado over Addendum "A2" in this proceeding. But it is an ado over nothing. Pardue was not required to buy the personalty unless he wished to do so. He did not wish to do so if it were going to cost him more than $10,000. This was apparently unacceptable to Plaintiff. So there was never any meeting of the minds on this option and, therefore, no contract for the sale of the personalty to Pardue was ever agreed upon. That Plaintiff did buy the personalty some months after the time that Plaintiff alleges that

the September 11, 1980 contract expired because of its own terms or because of an anticipatory breach by Pardue is of no moment in this proceeding.

The variances proposed in Pardue's attorney's letter were three.

First, it was proposed that the transaction could be closed into a joint venture owned at least fifty percent by Pardue as long as he was still personally liable on the note. But as was stated above, this was a loan commitment to Arch Pardue, not to a different entity. Pardue was attempting to get Plaintiff to pre-commit to a loan to an entity that it knew nothing about. Addendum "A1" of the September 11, 1980 contract specified that the contract could only be assigned by Pardue upon express written consent of Plaintiff. The terms of that consent were spelled out to be that Pardue would have to be a principal in the entity, that the entity have a net worth and liquidity equal or greater than Pardue or that it be guaranteed by parties satisfactory to Plaintiff.

The second variance proposed was that Pardue would have the option to use the proceeds of any insurance loss claim to rebuild the property in the event of any insured loss. This is directly contrary to the specification of paragraph (3) of "Exhibit A, Deed of Trust" to the September 11, 1980 contract. Paragraph (3) specified that Plaintiff would have the option of applying insurance proceeds to the indebtedness secured.

Thirdly, it was proposed that Plaintiff would be reasonable in approving the assumption of the loan upon a subsequent sale of the property. Paragraph (9) of "Exhibit A, Deed of Trust" to the September 11, 1980 contract gave unfettered discretion to Plaintiff to declare the loan due and payable upon sale of the property.

In essence, Pardue was refusing to go forward and fulfill his commitments under the September 11, 1980 contract.

The loan commitment letter also specified that the closing had to take place no later than November 15, 1980. As is apparent from the filing of this suit, no closing has ever taken place. At trial, Pardue admitted that no deal has ever been completely worked out by the parties (Transcript Volume II, p. 47).

The Parties did negotiate through the rest of 1980 but never did arrive at a new bargain. One problem that Pardue had was that he lost the experienced restaurateur sometime before the end of 1980. The covenants in favor of Crow & Brown No. 9 would have required a new approval of a new operator. Pardue has never specified if he or any other particular person or entity would be the new operator of the restaurant.

On January 8, 1981, Plaintiff's attorney sent a letter to Pardue advising him that the loan commitment and the September 11, 1980 contract were terminated because of his failure to close the transaction. Also, demand was made upon the title company for possession of a $5,000 check payable to Plaintiff which had been deposited with the title company as earnest money.

Defendant Pardue countered in a letter dated January 12, 1981, that he was without fault and ready, willing and able to close if only a date for closing were set. He tendered an additional $225,000 to the title company to take care of his obligations under the contract. Even at this late date, he did not specify that he would agree to the terms objected to in his attorney's October 15, 1980, letter.

Plaintiff has asked this Court to award it the $5,000 earnest money, the $47,769.00 that it paid the Bankruptcy Trustee for the personalty in the building and a judgment declaring that it owes nothing to Defendant Mike Lindsey & Co., Inc. Defendant Pardue has counterclaimed for either specific performance or the $5,000 and his damages. Defendant Mike Lindsey & Co., Inc., has counterclaimed for the $50,000 broker's fee due it upon closing. Both sides have claimed for attorneys' fees.

■ It is clear that no date for closing was ever set because Pardue refused to accept the loan commitment by Plaintiff

without certain changes being made. These changes were a repudiation of certain express terms in the September 11, 1980 contract. This was an anticipatory breach of the contract which excused Plaintiff from further performance and allowed Plaintiff to file this suit. *Rapid Transit Lines, Inc. v. Transit Ads, Inc.*, 401 S.W.2d 276, 282 (Tex.Civ.App.—Eastland, 1966, no writ). *Laredo Hides Co., Inc. v. H&H Meat Products Co., Inc.*, 513 S.W.2d 210, 220 (Tex. Civ.App.—Corpus Christi, 1974, writ ref'd. n. r. e.).[2]

Paragraph "13" of the September 11, 1980 contract specifically allows Plaintiff to reclaim the $5,000 as liquidated damages or to sue for specific performance. Plaintiff has made its choice, so it will be awarded the $5,000.

■ Mike Lindsey & Co., Inc.'s right to its $50,000 commission was made irrevocable by Paragraph "14" of the contract only upon closing. As Plaintiff was excused from closing by Pardue's anticipatory breach, Plaintiff never became duty bound to pay the $50,000.

■ As stated above, Addendum "A2" of the September 11, 1980 contract allowed Pardue the option to purchase the personalty in his discretion. His discretion was that he did not wish to purchase it for more than $10,000. Also, the personalty was purchased by Plaintiff quite some time after the breach by Pardue, at a time when it can be assumed that Plaintiff knew that the purchase was for its own benefit. Therefore, Plaintiff is not entitled to the $47,769.

It probably should go without saying that Defendant and Counter-Plaintiff Pardue is entitled to neither damages nor specific performance because of his breach of the September 11, 1980 contract. The other side of this is that Plaintiff is entitled to declarations in the judgment that it is not liable to either Defendant Pardue or Defendant Mike Lindsey & Co., Inc., for damages.

Plaintiff has requested $7,500 to $8,500 in attorneys' fees for attorneys' services in this Court, and $3,500 if the judgment is appealed to the Court of Appeals for the Fifth Circuit and another $3,500 if that Court's judgment is appealed to the Supreme Court.

■ This Court believes it to be the better practice to not allow attorneys' fees in advance for appellate work so will deny those fees without prejudice.

As all inclusive as the September 11, 1980 contract was, it did not provide for attorneys' fees in suits between the Parties arising out of that contract. But Art. 2226 of Vernon's Ann.Civ.St.[3] is ample authority to

---

**2.** The January, 1981, exchange of letters is only significant in that Plaintiff's attorney was making a formal demand for the $5,000 deposit. The right of Plaintiff to sue was fixed by the October 15, 1980, letter of Pardue's attorney.

**3.** Art. 2226 reads:

Any person, corporation, partnership, or other legal entity having a valid claim against a person or corporation for services rendered, labor done, material furnished, overcharges on freight or express, lost or damaged freight or express, or stock killed or injured, or suits founded upon a sworn account or accounts, or suits founded on oral or written contracts, may present the same to such persons or corporation or to any duly authorized agent thereof; and if, at the expiration of 30 days thereafter, payment for the just amount owing has not been tendered, the claimant may, if represented by an attorney, also recover, in addition to his claim and costs, a reasonable amount as attorney's fees. The usual and customary fees in such cases shall be presumed to be reasonable, but such presumption may be rebutted by competent evidence. In a proceeding before the court, or in a jury case where the issue of amount of attorney's fees is submitted to the court for determination by agreement, the court may in its discretion take judicial knowledge of the usual and customary fees in such matters and of the contents of the case file without receiving further evidence. The provisions hereof shall not apply to contracts of insurers issued by insurers subject to the provisions of the Unfair Claim Settlement Practices Act (Article 21.21–2, Insurance Code), nor shall it apply to contracts of any insurer subject to the provisions of Article 3.62, Insurance Code, or to Chapter 387, Acts of the 55th Legislature, Regular Session, 1957, as amended (Article 3.62–1, Vernon's Texas Insurance Code), or to Article 21.21, Insurance Code, as amended, or to Chapter 9, Insurance Code, as amended, and each such article or chapter shall be and remain in full force and effect. This Act shall be liberally construed to promote its underlying purposes.

award attorneys' fees in this Civil Action. It was necessary for Plaintiff to make its claim in this Court to press its claim for the $5,000 deposit.

Plaintiff's request for attorneys' fees in this Court was fully supported by the evidence introduced on trial and is customary and usual within the knowledge of this Court. Therefore, Plaintiff will be allowed attorneys' fees in the sum of $7,500.

 Though Plaintiff's recovery on its claim will be less than $10,000, it will not be denied its costs under 28 U.S.C. § 1332(b).[4] Plaintiff has prevailed on its claim for declaratory relief under 28 U.S.C. § 2201[5] by which it has avoided liability to the Defendants that would greatly exceed $10,000. In this instance, it will serve the purposes of 28 U.S.C. § 1332(b) to award Plaintiff its costs.

---

4. 28 U.S.C. § 1332(b) reads:

(b) Except when express provision therefor is otherwise made in a statute of the United States, where the plaintiff who files the case originally in the Federal courts is finally adjudged to be entitled to recover less than the sum or value of $10,000, computed without regard to any setoff or counterclaim to which the defendant may be adjudged to be entitled, and exclusive of interest and costs, the district court may deny costs to the plaintiff and, in addition, may impose costs on the plaintiff.

5. 28 U.S.C. § 2201 reads:

In a case of actual controversy within its jurisdiction, except with respect to Federal taxes other than actions brought under section 7428 of the Internal Revenue Code of 1954 or a proceeding under section 505 or 1146 of title 11, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.