**1402**

COMMERCE PUBLISHING
CORPORATION, Plaintiff,

v.

UNITED STATES POSTAL SERVICE
and United States of America, Defend-
ants and Third-Party Plaintiffs,

v.

TEXAS PARADE, INC., Lone Star Publi-
cations, Inc., Lone Star Publishers, San
Antonio American Printers, Inc., Ken-
neth E. Lively and Martin Green, II,
Third-Party Defendants.

Civ. A. No. CA3–81–0633–G.

United States District Court,
N.D. Texas,
Dallas Division.

Feb. 2, 1984.

Joseph Geary, Geary, Stahl & Spencer, Dallas, Tex., for plaintiff.

Chas. D. Cabaniss, Asst. U.S. Atty., Dallas, Tex., Jeffrey H. Zelkowitz, Stanley F. Mires, U.S. Postal Service, Washington, D.C., Roger J. Allen, Turner, Hitchins, McInerney, Webb, Hartnett & Strother, Dallas, Tex., Chas. R. Shaddox, Stephen Walraven, Shaddox, Gorham & Good, Kenneth E. Lively, San Antonio, Tex., for defendants and third-party plaintiffs.

## MEMORANDUM ORDER

FISH, District Judge.

The court has before it the motion for partial summary judgment of defendants United States Postal Service and the United States of America (jointly referred to herein as "the Service"), the motion for summary judgment of plaintiff Commerce Publishing Corporation ("CPC"), and the motion to dismiss of third-party defendant Kenneth E. Lively. For the reasons explained below, CPC's motion and the Service's motion against Texas Parade, Inc. are granted but the remaining motions are denied.

### The Background

The central issue in this case is whether CPC or a third-party defendant, Lone Star Publications, Inc., is liable for a postage deficiency incurred on mailings of *Texas Parade* magazine between September, 1974 and July, 1976. *Texas Parade* was owned by Texas Parade, Inc. (the predecessor of Lone Star Publications, Inc.) when the mailings in question occurred.

During the period in question, *Texas Parade* was authorized second-class mail privileges at the San Antonio, Texas post office, which maintained an advance deposit account in the name of *Texas Parade* magazine. An audit of *Texas Parade*[1] conducted several years later by the Postal Service revealed that because of certain mailing practices of the magazine, the publication had paid $33,764.37 less in postage than it should have. The deficiency apparently developed from *Texas Parade's* payment of postage at second-class rates, rather than the appropriate higher transient rate, on copies of the publication purchased under nominal rate subscriptions. The amount of the postage deficiency and the fact that it has not been paid are undisputed, although the parties hotly contest liability.

On February 28, 1978, CPC reached an agreement[2] with Texas Parade, Inc., by which it purchased certain assets.[3] Among those assets was *Texas Parade* magazine, which appeared for the last time in March 1978 and then merged with CPC's publication, *Texas Business*. Texas Parade, Inc. continued as a business entity, but subsequently changed its name to Lone Star Publications, Inc. *Texas Business* magazine is authorized second-class mail privileges at the United States Post Office in Dallas, Texas, where an advance deposit account in the name of the publication is maintained.

On July 20, 1979, CPC requested the San Antonio Post Office to close the advance deposit account of *Texas Parade* at that post office and to remit the monies in that account, $262.07, to *Texas Business*. The San Antonio Post Office complied with that request on July 25, 1979. Several months later, on April 21, 1980, the Service notified CPC of the postage deficiency incurred on

1. The Service periodically conducts in-depth audits of publications to verify that publications authorized for second-class mail privileges continue to be eligible for such privileges, and mail, at the second-class rate, only the number of copies entitled to those rates.

2. That agreement was evidenced by a written instrument entitled "Asset Purchase Agreement."

3. At that time, neither party to the contract had been notified of the postage deficiency which had accrued earlier.

mailings of *Texas Parade* and requested payment of that deficiency.

### Procedure

CPC initiated this suit with an application for injunctive relief to prevent the Service from collecting the postal deficiency by deducting $1,864.84 per month from CPC's advance postal account and from conditioning the acceptance of mailings of *Texas Business* on maintenance of sufficient funds in the account to cover both installments on the deficiency and current mailings. This court granted the injunctive relief. The Service counterclaimed against CPC for the amount of the deficiency plus interest and joined as third-party defendants Texas Parade, Inc., Lone Star Publications, Inc.,[4] San Antonio American Printers, Inc., Kenneth E. Lively and Martin Green II,[5] claiming that these parties were also liable for the deficiency.

During the pendency of this suit, defendant Lone Star Publications a/k/a Texas Parade, Inc. filed a voluntary petition for bankruptcy in the United States Bankruptcy Court for the Western Division of Texas, San Antonio Division. This court determined that the allegations against the debtor and its co-defendants presented common questions of law and fact which should be resolved in one proceeding and accordingly stayed this action until the bankruptcy court resolved the creditor claims against Lone Star. That stay has now been lifted.

### The Governing Law

This deficiency arose during the period between passage of the Postal Reorganization Act of 1970[6] and the establishment of the Domestic Mail Classification Schedule (DMCS) on June 2, 1976. In that interim, the mail classification system in effect was still the system established by Congress and codified in former Title 39. *See* Pub.L. No. 91–375 §§ 3 and 5(f). Incorporated by reference in 39 C.F.R. §§ 111–173 are the regulations covering second class mail found in Chapter I of the Postal Service Manual ("PSM") (Exhibit F to the Service's motion for partial summary judgment).

The Service maintains that this is the applicable law, yet in its brief consistently refers to provisions of the Domestic Mail Manual ("DMM") which did not supersede Chapter I of the PSM until July 30, 1979. The court has, for the most part, ignored the cited provisions of the DMM, referring instead to the corresponding provisions of the PSM in force at the time that the deficiency arose.

### The Service's Motion for Partial Summary Judgment against CPC

The Service contends that a postal deficiency is and remains the liability of the publication whose mailings incurred the deficiency, rather than the liability of the owner or entity which mailed the publication. Under this theory, the Service reasons that CPC is liable for the deficiency because CPC purchased certain assets from Texas Parade, Inc. on February 28, 1978, and *Texas Parade* magazine ceased to exist after the March 1978 issue, when it was consolidated with CPC's *Texas Business*.

Thus, according to the Service, the liability incurred by Texas Parade, Inc. on behalf of *Texas Parade* became the liability of CPC when CPC purchased the assets of Texas Parade, Inc., because CPC acquired the magazine *Texas Parade*. In support of this contention, that the successor in interest to the *publication* (*Texas Parade*), rather than the successor in interest to the publication's *owner* (Texas Parade, Inc.), must pay the postage deficiency, the Service maintains that "applicable postal laws and regulations ... demonstrate a clear intent that the publication is liable for a postage deficiency incurred by it at any time in the past."

The regulations relied on by the Service are insufficient to support the contention

---

**4.** An additional defendant, Lone Star Publishers, was later dismissed from this action.

**5.** Lively and Green are alleged to be shareholders of Texas Parade, Inc.

**6.** Pub.L. No. 91–375, 84 Stat. 719 (August 12, 1970). The Act created the United States Postal Service as an independent establishment of the executive branch of government, removing from Congress rate making and mail classification authority.

that a postage deficiency remains the liability of the publication, rather than the obligation of the publisher, owner or entity that distributes it. Significantly, both Section 132.31 of the PSM and the corresponding provision of the DMM, § 441.1, require the *publisher*, rather than the *publication*, to file an application for consideration of second-class authorization. Although it is true that DMM § 444.1 invariably uses the word "publication", that regulation was not in force at the time the deficiency arose. Furthermore, the corresponding provision of the PSM, which was in force at that time, places strong emphasis on the role of the publisher:

> Publishers must determine the number of issues they will publish each year and adopt a statement of frequency ... A publication may not be published under a frequency .... Publishers may change the number of issues ... When a publication fails to maintain regular issuance, the postmaster will inform the publisher ... or if the publication is discontinued, the postmaster will report all the facts, including the publisher's current mailing address, to the Mail Classification Division for determination as to whether proceedings should be instituted to revoke the second class mail privilege.

PSM § 132.221.

Under both the PSM and the DMM, it appears that the privilege of mailing at the second class rate is conferred on a publication, rather than on the individual or entity which owns it. The proportion of editorial to advertising content, the subscriber list, number of sample copies distributed, and number of subscriptions purchased at a discount determine the eligibility of the publication to mail at the reduced rate. Where one publishing house owns several publications, these factors would inevitably vary from one publication to the other.

■ Nevertheless, the privilege of mailing at the second class rate and the obligation to pay for any deficiency which might accrue need not be imposed on the same party, especially where, as in this case, the publication and the entity which controlled it have parted ways. Several requirements of the PSM confirm this conclusion: PSM § 132.31 (the publisher must file an application for second class rates); PSM § 132.36 (before taking action, the government's representative may call in the publisher for additional information, and the publisher receives notice of denial, if any); PSM § 132.6 (each owner of a publication having second-class mail privileges to furnish to the public and to the Postmaster General, on a yearly basis, information identifying publishers and owners, stockholders (if a corporation owns the publication), bondholders, mortgagees and other security holders, in addition to the names of the editor and managing editor). *See* also PSM § 132.61.

Most telling of all is the PSM's final provision dealing with second-class rates. It reads as follows:

> The Manager, Mail Classification Division, Finance Department ... may call on a publisher from time to time bearing on *the publisher's right to retain a second-class entry for his publication.* When the Manager determines that a publication is no longer entitled to its second-class entry, he issues a ruling of suspension or revocation to the publisher at the last known address of the office of publication stating the reasons therefor. The ruling becomes effective in 15 days from receipt by the publisher unless the publisher appeals therefrom [emphasis added].

PSM § 132.82.

■ The applicable regulations do not demonstrate unequivocally an intent to hold the publication, rather than the publisher, liable for any postal deficiency. To the contrary, the regulations evince an intent to deal with the publication insofar as possible, but to hold the publisher-owner(s) ultimately responsible for any postal deficiency which might be incurred.

All parties agree that at the time this deficiency arose, Texas Parade, Inc. (later renamed Lone Star Publications, Inc.), was the publisher-owner of *Texas Parade.* Since the court can find no support in the law or regulations for the Service's position that CPC became liable for the deficit when

it acquired *Texas Parade*, the Service's motion for partial summary judgment against CPC must be denied.

### CPC's Motion for Summary Judgment

■ As correctly defined by CPC's brief, the real issue in this case is whether CPC assumed the liabilities of Texas Parade, Inc. when CPC entered into the contract entitled "Asset Purchase Agreement" on February 28, 1978. Apparently the Service had not yet determined at that time that it would claim a deficiency for the period 1974–1976.[7]

The Service contends that it would be unjust to allow CPC to avoid the consequences of ownership by characterizing what it acquired as a collection of individual assets rather than the sum of the assets. That Texas Parade, Inc. continued as a corporate entity, however, belies the Service's claim that CPC acquired the sum of the assets of the publisher-owner, as opposed to that of the publication. *Cf. Rapid Transit Lines, Inc. v. Transit Ads, Inc.*, 401 S.W.2d 276, 284 (Tex.Civ.App.—Eastland 1966), no writ.

Even assuming, however, that CPC had acquired all of the assets of the publisher-owners of *Texas Parade*, the written agreement expressly provides in Section 9A that:

(ii) Seller shall bear the cost of publishing the Magazine through the March, 1978 issue; thereafter the costs of publication shall be borne by Purchaser.

. . . . .

(iv) Seller shall be responsible for all taxes, insurance and other expenses connected with the publication and sale of the Magazine through the March, 1978 issue thereof; and

(v) Purchaser is assuming no liabilities of Seller.

■ The court has received neither argument nor authority from the Service that it can look beyond the plain meaning of the agreement between CPC and Texas Parade, Inc. Under Texas law, the purchasing corporation does not, merely by a purchase of assets, become liable for the debts of the selling corporation. *American Surety Co. of New York v. M–B Ise Kream Co.*, 38 S.W.2d 118, 123 (Tex.Civ.App.—Dallas 1931), *aff'd*, 65 S.W.2d 287 (Tex.Comm. App.1933); *Texas State Fair & Dallas Exposition Assn. v. Caruthers*, 8 Tex.Civ. App. 474, 29 S.W. 48, 50 (1894), no writ. *See also Int'l. Assn. of Machinists v. Falstaff Brewing Corp.*, 328 S.W.2d 778, 781 (Tex.Civ.App.—Houston 1959), no writ. *Accord, Gee v. Tenneco, Inc.*, 615 F.2d 857 (9th Cir.1980) (citing California law); *Kemos, Inc. v. Bader*, 545 F.2d 913 (5th Cir. 1977) (Georgia law); *Leannais v. Cincinnati, Inc.*, 565 F.2d 437 (7th Cir.1977) (Wisconsin law).

Accordingly, CPC's motion for summary judgment is granted.

### The Service's Alternative Motion for Summary Judgment Against CPC

■ In view of the language of the asset purchase agreement that CPC purchased "all of the properties and assets, tangible and intangible . . . owned by Seller and utilized in or resulting from the ownership and/or publication of *Texas Parade* magazine,"[8] the Service's alternative motion that CPC be required to return the magazine's asset of $262.07, which the Service refunded from the *Texas Parade* advance postage account at CPC's request, is denied.

### The Service's Alternative Motion for Summary Judgment Against Texas Parade, Inc.

■ The Service's other alternative motion for partial summary judgment, that Texas Parade, Inc., now Lone Star Publications, Inc., be held liable for the full amount of the deficiency,[9] is granted. That *Texas Parade* magazine no longer

---

**7.** After audit and downward adjustment, the Service finally demanded payment from CPC on April 21, 1980.

**8.** Asset Purchase Agreement, Section 1A.

**9.** See the Service's memorandum in support of its motion for partial summary judgment at 28, in which the Service requests that, if the deposit account monies are not applied to the postage deficiency, that Texas Parade, Inc. (rather than all the third party defendants) be ordered to

exists and that Texas Parade, Inc. owned *Texas Parade* magazine throughout the period in which the deficiency arose are not in dispute. Moreover, Texas Parade, Inc. has not opposed, by affidavits or otherwise, its liability or the entry of summary judgment against it.[10] The evidence of the Service must therefore be accepted as true. *See* Wright & Miller, Federal Practice & Procedure § 2727 at 133–34.

It is therefore ordered that the Service recover from Lone Star Publications, Inc. the postage deficiency in the amount of $33,764.37, with interest at the legal rate from March 31, 1981 to the date of payment.

### The Motion to Dismiss

Kenneth E. Lively, a third-party defendant who is allegedly a stockholder of Texas Parade, Inc., as well as a former President, Secretary, Director and Editor of *Texas Parade* magazine, moves the court to dismiss this action as to him. He challenges the sufficiency of the complaint, asserts that the statute of limitations bars the Service's third-party complaint, and contends that venue is improper. Lively has not established, however, that the Service cannot prove any set of facts that would entitle it to relief against him. Lively's motion to dismiss is therefore denied.

In summary, the Service's motion for summary judgment against Commerce Publishing Company is **DENIED** in its entirety, CPC's motion for summary judgment is **GRANTED,** and the claims against Commerce Publishing Company are **DISMISSED** from this action; the Service's motion for summary judgment as to Texas Parade, Inc. is **GRANTED,** and the motion to dismiss of Kenneth E. Lively is **DENIED.**

---

reimburse the Service for the full amount of the deficiency.

**10.** Texas Parade, Inc. merely joined the request of several other third-party defendants for a stay in bankruptcy, which the court granted. That stay has now been lifted.